UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PATRICK LAMBEY,

            Plaintiff,

   v.

CALIFORNIA DEPARTMENT OF
INSURANCE, et al.,

            Defendants.

No.  2:11-CV-02392-KJM-KJN

ORDER

       This matter is before the court on defendants' motion for summary judgment or, in the alternative, summary adjudication.  ECF No. 26.  The court heard the motion on September 27, 2013.  Daniel M. Karalash appeared for plaintiff, and Bart Hightower appeared for defendants.  For the reasons below, the court GRANTS defendants' motion in its entirety.

I.     <u>PROCEDURAL AND FACTUAL BACKGROUND</u>

       Plaintiff Patrick Lambey ("plaintiff") filed a discrimination complaint with the California Department of Fair Employment and Housing ("DFEH") on May 9, 2011 and received a right-to-sue letter on May 13, 2011.  He then filed the instant complaint in California Superior Court on September 9, 2011 against defendants California Department of Insurance ("CDI"), Eric Weirich, Rick Plein and Martin Gonzalez.  The complaint alleges three causes of action against all defendants: (1) discrimination and harassment based on race in violation of

1

the California Fair Employment and Housing Act ("FEHA"), Cᴀʟ. Gᴏᴠ'ᴛ Cᴏᴅᴇ § 12940; (2) failure to prevent discrimination and harassment based on race in violation of FEHA; and (3) race and national origin discrimination in violation of 42 U.S.C. § 1983.  On federal question grounds, defendant CDI removed to this court.  On defendants' motion, defendants Weirich, Plein and Gonzalez were dismissed from the two FEHA claims, and defendant CDI was dismissed from the section 1983 claim.  Defendants moved for summary judgment on August 21, 2013, plaintiff opposed on September 13, 2013 and defendants replied on September 20, 2013.

Plaintiff is an African-American male from Belize.  Pl.'s Undisputed Material Fact ("UMF") 3, ECF No. 47.  He began working for defendant CDI as an investigator in or around 1988.  Lambey Dep. 16:21–17:02.  The undisputed material facts giving rise to this suit all occurred while plaintiff was employed by defendant CDI.  *See generally* Pl.'s UMFs, ECF No. 47; Def.'s UMFs, ECF No. 28.  They are as follows:

2000

Between 1999 and 2000, Howard Hughie interrupted conversations plaintiff was having with other people about Belize, calling it a third-world country.  Def.'s UMF 130, ECF No. 28.  At some point, Hughie also said that there was only one general in Belize and that plaintiff could be it.  *Id.* 129.  Plaintiff did not report Hughie's comments to management.  *Id.* 131.

In late 2000, plaintiff interviewed for sergeant positions in Orange and San Diego.  *Id.* 1.  Following the San Diego interview, San Diego Captain John Standish selected plaintiff for the San Diego position, *id.* 2; however, plaintiff told him he preferred the position in Orange, *id.* 3.  Standish then assured him the Orange position would be his.  *Id.*

When plaintiff went to the Orange office, however, acting Orange Captain Hughie informed him that Detective Robert Tomlin had been selected for the Orange position.  *Id.* 4.  Plaintiff then spoke to Standish again, who promised to resolve the misunderstanding and asked plaintiff to write a memorandum discussing his qualifications for the sergeant position.  *Id.* 5–6.

2

At that time, Edd Malone, an African American, was the Orange captain, but he was on medical leave. *Id.* 7–8. Malone had already been considering plaintiff and Yvette Cordero for the position, *id.* 9, so when he learned that Hughie had selected Tomlin, Malone spoke with the members of the interview panel, Standish, Hughie and Henry Avina, *id.* 10. Standish and Avina both said that plaintiff had done very well in the interview. *Id.* When he spoke with Hughie, Malone asked why he had selected Tomlin for the position. *Id.* 11. Hughie replied that Tomlin, who had previously worked for the Inglewood Police Department, had more law enforcement experience than plaintiff. *Id.* Following these discussions, Malone contacted Dale Banda, Director of the Fraud Division, and recommended plaintiff for the sergeant position in Orange. *Id.* 12. Plaintiff received the promotion in January 2001. *Id.* 13.

### 2001

In November 2001, the Orange and Commerce offices of defendant CDI played each other in a softball game, *id.* 15, and the Orange office prevailed, *id.* 21. After the game, Shawn Ferris, who worked in the Commerce office, sent an email to plaintiff and three other coworkers. *Id.* The email included two attachments: (1) a photoshopped picture of a prisoner with plaintiff's face superimposed; and (2) a photoshopped mugshot of plaintiff with the caption "FBI Ten Most Wanted Fugitive Usama Bin Lambey." *Id.* 15–16. Within hours of receipt of the email, plaintiff responded and told Ferris that the emails were offensive, *id.* 17, but did not report the emails to management, *id.* 19. Ferris sent no further emails. *Id.* 18. Plaintiff was not in Ferris's chain of command, and Ferris never participated in any promotional process involving plaintiff. *Id.* 20.

### 2003

Despite working at defendant CDI through 2013, *id.* 32, plaintiff's last annual performance review was in September 2003, *id.* 22. From 2003 to 2011, plaintiff's supervisor was Captain Marty York. *Id.* 24, 30. She supervised plaintiff, among several other employees, and was responsible for preparing their annual performance reviews. *Id.* 25–26. She also oversaw defendant CDI's Professional Standards Unit, a then-new unit, which encompassed internal affairs and background checks. *Id.* 27.

1    In 2011, Captain Kathleen Rooney took over management of the Professional

2  Standards Unit and responsibility for preparing the annual performance reviews of multiple

3  employees, including plaintiff. *Id.* 30–31.  At the time of plaintiff's retirement, Rooney was

4  still responsible for his reviews. *Id.* 31–32.  Although he stopped working on March 15, 2013,

5  plaintiff's employment officially ended on March 18, 2013. *Id.* 31.  Rooney never wrote

6  plaintiff a review. *Id.* 22.

7                    2004

8    In August 2004, plaintiff was assigned to conduct an internal affairs

9  investigation of an employee working under Bureau Chief Moses Gomez. *Id.* 38.  Plaintiff

10  notified Gomez of the investigation on August 17, 2004 and subsequently interviewed him. *Id.*

11  39–40.[1]  As an internal affairs investigator, plaintiff's role was to interview potential witnesses

12  and prepare a report, *id.* 42; however, he could not make decisions regarding discipline or other

13  adverse action, *id.* 41.  Instead, any recommendations for adverse action were submitted by the

14  deputy commissioner to human resources for further review. *Id.* 43.

15                During the same period, plaintiff was competing for captain positions in Fresno

16  and Commerce. *Id.* 44.  He interviewed for the Fresno position on September 9, 2004, *id.* 49,

17  and as bureau chief for the Central California region, Gomez participated in the interviews, *id.*

18  47.  The panel, including Gomez, interviewed all candidates for the position. *Id.* 50.  Plaintiff

19  did not receive the promotion. *Id.* 51.

20                On December 6, 2004, plaintiff sent an email to Banda, who had risen to deputy

21  commissioner and directly supervised bureau chiefs, including Gomez. *Id.* 48, 53.  The email

22  described the events relating to the internal affairs investigation and the captain position in

23

24

_____

25       [1] The parties dispute whether Gomez was himself being investigated.  Pl.'s Opp'n to
Def.'s UMF 40, ECF No. 47.  Additionally, although plaintiff argues defendant Gonzalez was
26  also questioned as part of this investigation, the evidence cited indicates only that plaintiff
questioned Gonzalez as part of an internal affairs investigation.  Gonzalez Dep. 24:7–10, Pl.'s
27  Opp'n to Def.'s MSJ Ex. 4, ECF No. 51.  No details are provided regarding the timing or
subject matter of that investigation. *See generally id.*

28

Fresno; in it, plaintiff withdrew from consideration for the Commerce position.  Hightower

Decl. Ex. G, ECF No. 29-1, 177.  The email is excerpted as follows:

> I think it is important for you to know how people that are trying
> to do a good job can be negatively impacted by issues that may
> seem inconsequential. . . . [O]n August 17, 2004 Bureau Chief
> Gomez was advised that an administrative investigation was
> opened into allegations that he improperly telephoned a SEIU
> Union Representative . . . .  I [was] charged with conducting this
> investigation. . . .  On September 9, 2004, I interviewed for the
> Chief's position in Fresno.  This is for a position that is directly
> under the supervision of Bureau Chief Gomez.  [He] sat on the
> interview panel and was an intricate [sic] part of the decision
> making process.  Please understand I am not lodging a complaint
> nor am I saying that I was treated unfairly.  However, last week I
> sent Human Resources a notice asking them to remove my name
> from the list of competitors for a Chief's position in Commerce.
> Again, that position would be under the purview of Bureau Chief
> Gomez.  I did this because I believe that I will not have a chance
> to promote in this upcoming process.  I am not implying that
> Bureau Chief Gomez acted unfairly . . . .  This is information I
> hope you will use to stop these types of occurrences.  I am
> convinced that at some point in the future I will be promoted.

*Id.*  Banda reviewed the promotional process but did not feel any action was necessary.  Def.'s

UMFs 54–55, ECF No. 28.

                              2005

        Within defendant CDI's fraud division, there were three ways in which

employees could transfer from one location to another: (1) geographic transfers of rank-and-

file, non-management employees, which occurred twice annually with officers submitting

transfer requests for vacant positions; (2) transfers for management employees, where

vacancies were posted and interested managers submitted applications; and (3) hardship

transfers, which were allowed only in situations where employees were dealing with situations

out of their control.  *Id.* 56.  In May 2004, plaintiff first requested a transfer from Orange

County to Sacramento because his wife was to begin a radiology residency in Oregon in July

2004.  *Id.* 57.  When unsuccessful, he tried again in July 2004, this time expanding his request

to Sacramento, Benicia, San Jose or Fresno.  *Id.* 58.  Still unsuccessful, he finally requested a

hardship transfer in October 2005.  *Id.* 59.

/////

Defendant CDI's hardship transfer policy was designed to assist employees dealing with serious hardships arising from circumstances beyond their control. *Id.* 68. Such circumstances were usually, but not always, medical in nature; thus, the policy allowed for transfers due to medical conditions or emergencies of the employee or a family member if properly documented. *Id.* 61, 68. If the transfer was requested for non-health reasons, the policy required the applicant to submit a memorandum detailing the reasons for transfer. *Id.* 61. In all cases, the policy required investigation into the circumstances surrounding the request. *Id.* 62.

Banda tasked York with investigating plaintiff's request, *id.* 64, and York submitted a memorandum with her findings and recommendations on October 28, 2005, *id.* 65. In it, she described plaintiff's difficulties regarding his wife's radiology residency in Oregon, their purchase of a home in Oregon and sale of their home in Southern California and the constant commuting. *Id.* 66. Nonetheless, she concluded that the hardship was self-induced, not the product of unavoidable problems. *Id.* 67. On these grounds, the request was denied on November 8, 2005. *Id.* 70.

On December 12, 2005, plaintiff submitted a request for reconsideration. *Id.* 71. In the request, he explained that his wife was forced to switch to the program in Oregon because the Los Angeles hospital where his wife had previously worked had discontinued its radiology program. Hightower Decl. Ex. H, ECF No. 29-1 at 187–88. This request was denied on the same grounds. Def.'s UMF 73, ECF No. 28. Nonetheless, plaintiff ultimately relocated to Sacramento. *Id.* 77.

In 2004 and 2005, before his relocation, plaintiff shared acting captain duties with David Goldberg when then-Captain Avina was absent. *Id.* 79. Supervisors, such as plaintiff and Goldberg, would rotate into the acting captain position as a means of gaining management experience and cross training opportunities. *Id.* 84–85.

In early 2005, Avina took an extended leave, *id.* 80, and Bureau Chief Standish felt it best to assign a single acting captain in Avina's absence, rather than continue rotating, *id.*
/////

81.  Director Banda authorized Standish to do so, *id.* 82, and Standish selected Goldberg, *id.*

87.  Goldberg was the most senior sergeant in the Orange office.  *Id.* 87.

2007

In January 2007, plaintiff left his role as head of the statewide firearms program.

*Id.* 89.  As head, his responsibilities had included traveling throughout the state with firearms,

ammunition and other sensitive equipment; for that job, he had been issued a vehicle capable of

safe, secure and discreet transport.  *Id.* 95.  Those duties were assumed by Sergeant Tom

Sarinana, and plaintiff was instructed to exchange vehicles with him.  *Id.* 89–90.  After

relinquishing his vehicle, plaintiff was given Sarinana's former vehicle, a Ford Taurus with

63,000 miles that had not been serviced in a year.  *Id.* 92.  After the vehicle exchange, plaintiff

emailed his supervisor, Captain York, complaining about the Taurus and calling his situation

"predictable."  *Id.*  In response, York offered plaintiff her vehicle, which had fewer miles.  *Id.*

93.  Plaintiff did not accept the offer.  *Id.*

2010

On July 27, 2010, plaintiff interviewed for the Benicia captain position.  *Id.* 97.

All candidates were interviewed by defendants Gonzalez and Weirich, respectively, the

Southern California Bureau Chief and Fraud Division Chief, at the time.  *Id.* 101–02.  It was

standard practice for candidates to be interviewed by a two-person panel.  *Id.* 102.  The

interview consisted of nine questions prepared by defendant Weirich, which were read aloud to

each candidate from a typed sheet of paper.  *Id.* 105.  Defendants Weirich and Gonzalez then

scored each candidate's answers.  *Id.* 106.

To determine the scores, defendants Weirich and Gonzalez used a document

entitled "Rating Criteria for Job Interview Questions."  *Id.* 108; Hightower Decl. Ex. M, ECF

No. 29-1 at 219.  The rating criteria were based on a ten-point scale: scores of zero to four

indicated an incomplete or poorly constructed response; scores of five to six indicated a

response that was not well constructed and left out a substantial number of details; scores of

seven to eight indicated a response that was substantially complete; and scores of nine to ten

indicated a response that was complete, orderly and detailed.  *Id.* 110.  Defendants Weirich and

Gonzalez each assigned plaintiff a total score of fifty-four, *id.* 111, the lowest of the three

candidates' scores, *id.* 113.  Defendants Weirich and Gonzalez also assigned plaintiff the same

score on each of the nine questions.  Hightower Decl. Ex. N, ECF No. 29-1, DOI00963–64.

Following the interviews, defendants Weirich and Gonzalez presented their

recommendation and the application materials of each candidate to defendant Plein, then-

deputy commissioner.  *Id.* 115–16.  As of July 30, 2010, no decision had been made, and

defendant Weirich emailed the candidates to update them, adding that the decision was an

"important and difficult one."  *Id.* 119.  Finally, based on the interviews, as well as his own

review of the candidate eligibility list and familiarity with the candidates, defendant Plein

approved the recommended candidate.  *Id.* 117–18.  Plaintiff did not receive the position;

instead, Aaron McKenzie was promoted to captain on August 2, 2010.  *Id.* 100.  Defendant

Weirich informed plaintiff of the decision that same day before the formal announcement was

made, stating that McKenzie had "aced" the interview.  *Id.* 122–123.

On August 18, 2010, plaintiff told York that his wife was considering a job in

Oakland.  *Id.* 126.  York responded that "nobody lives there."  *Id.*  She also told plaintiff that he

should be proud of his accomplishments considering where he came from.  *Id.* 128.

<u>2011</u>

In June 2011, plaintiff submitted his application materials to take the statewide

supervising fraud investigator II examination to become eligible and reachable for available

captain positions.  *Id.* 133.  He was interviewed as part of the examination process on July 14,

2011.  *Id.* 134.

The interview consisted of seven questions, asked of all examinees.  *Id.* 135.

The questions, rating criteria and suggested responses had been developed thirty to sixty days

before the examination by defendant CDI's subject matter experts Michael Godard, Chief of

the Investigations Division, defendant Weirich, Chief of the Fraud Division and Robert Yee,

Fraud Bureau Chief of Northern California.  *Id.* 140, 142.  These persons prepared the

examination materials because they were knowledgeable about the work to be performed and

/////

the qualifications necessary by virtue of their holding the classification themselves or supervising individuals in the classification. *Id.* 141.

The interview panel consisted of three judges: a chairperson and two state service representatives. *Id.* 138, 148, 152. The chairperson represented the State Personnel Board ("SPB") to ensure that the interview was conducted in accordance with SPB rules. *Id.* 148. Only individuals certified by the SPB could serve as chairpersons. *Id.* The chairperson for plaintiff's interview was Maryliz Richter. *Id.*

The two state service representatives represented defendant CDI's interests during the interviews. *Id.* 149. They were subject matter experts, generally selected from the hiring division. *Id.* SPB rules required that only persons who held the examination classification or supervised individuals holding the classification could serve as state service representatives. *Id.* Only five individuals were eligible to serve as representatives for the examination at issue. *Id.* 150. Defendant Plein, Deputy Commissioner at the time, selected Godard and defendant Gonzalez so that both the fraud and investigation divisions would be represented in the process. *Id.* 152.

The interview panel scored each question on a possible seven-point scale, on scoring worksheets. *Id.* 138, 154. The points corresponded to rating categories of "Not Qualified," "Qualified" and "Well Qualified." *Id.* 154. The maximum possible raw score was 147, and the minimum passing raw score was sixty-three. *Id.* 138. The raw scores were then converted using a scale mandated by the SPB. *Id.* 136.

Plaintiff did not pass the examination. *Id.* 174–75. All three panel members scored plaintiff as "Qualified" on questions one and two and as "Not Qualified" on the remaining five questions. *Id.*162. He received a raw score of seventeen from each member of the panel, for a total raw score of fifty-one. *Id.* As part of the process, an audit was subsequently conducted by Human Resources Analyst Cecille Ramirez, and no grading discrepancies were found. *Id.* 176–81.

Before 2008, SPB had administered promotional examinations differently. *Id.* 188. Under the previous regime, interview panel members were allowed to consider each

candidate's complete application package during the oral interview, including employment history, work experience and professional accomplishments. *Id.* 184. This allowed candidates to benefit from overall professional accomplishments in the scoring of their answers during the interview portion of the examination. *Id.* 185. After 2008, however, SPB rules were designed to ensure that the scores given during a candidate's interview were based solely upon each candidate's answers to the standardized questions. *Id.* 190. As such, panel members in subsequent examination administrations were barred from referencing any portion of a candidate's application package during the interview. *Id.* 189.

II.   STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, who "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . . ; or show . . . that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts . . . ."). Moreover, "the requirement is that there be no *genuine* issue of *material* fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

/////

10

1    In deciding a motion for summary judgment, the court draws all inferences and

2  views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

3  587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

4  whole could not lead a rational trier of fact to find for the non-moving party, there is no

5  'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v.*

6  *Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

7  III.    ANALYSIS

8        A.  FEHA Discrimination Claim

9            1.  Disparate Treatment

10               Plaintiff alleges defendant CDI intentionally discriminated against him on the

11  basis of race and national origin, thereby violating the FEHA.  Defendant CDI denies any

12  discrimination, instead arguing that it is entitled to summary judgment on the claim because:

13  (1) plaintiff has failed to present evidence suggesting that defendant CDI's asserted legitimate,

14  nondiscriminatory reasons for its actions are pretextual; and (2) plaintiff suffered no adverse

15  employment action.

16               Under the FEHA, it is illegal for an employer to discriminate against an

17  employee "in compensation or in terms, conditions, or privileges of employment" on the basis

18  of race, color, or national origin.  CAL. GOV'T CODE § 12940(a).  In the absence of direct

19  evidence of discriminatory intent, as here, courts apply the *McDonnell Douglas* burden-shifting

20  framework to FEHA claims.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04

21  (1973); *see also Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007) (applying Title VII

22  framework to FEHA claim).  Under this framework, the plaintiff must, in most cases, first

23  establish a prima facie case of discrimination, the elements of which will vary according to the

24  specific situation.  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000).  Generally, a plaintiff

25  is required to show: "(1) he [or she] was a member of a protected class, (2) he [or she] was

26  qualified for the position he [or she] sought or was performing competently in the position he

27  [or she] held, (3) he [or she] suffered an adverse employment action . . . and (4) some other

28  circumstance suggest[ing] discriminatory motive [i.e. similarly situated employees were treated

11

more favorably].” *Id.* at 355 (citations omitted).  In all cases, though, “a plaintiff must offer evidence that give[s] rise to an inference of unlawful discrimination.” *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (1996) (alteration in *Nidds*; citation and internal quotation marks omitted).  The plaintiff’s burden at this stage is “not onerous.” *Tex. Dep’t of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

An “adverse employment action” is a “shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under” FEHA. *Yanowitz v. L’Oreal U.S.A.*, 36 Cal. 4th 1028, 1049 (2005).  Such an action must “materially affect[] the terms, conditions, or privileges of employment,” *id.* at 1051, or “[be] reasonably likely to impair a reasonable employee’s job performance or prospects for advancement,” *id.* at 1054–55.  It may consist of a “series of subtle, yet damaging, injuries,” *id.* at 1055; however, the net effect must be “substantial and detrimental to be actionable,” *Horsford v. Bd. of Trs. of Cal. State Univ.*, 132 Cal. App. 4th 359, 373 (2005).  Adverse employment actions are to be contrasted with “a mere offensive utterance or even a pattern of social slights,” as well as “[m]inor or relatively trivial adverse actions or conduct . . . that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee . . . .” *Yanowitz*, 36 Cal. 4th at 1054.  Nonetheless, “adverse employment action” is to be “interpreted broadly to further the fundamental antidiscrimination purposes of the FEHA.” *Id.* at 1053.

If the plaintiff makes the requisite showing, “the burden shifts to the employer to rebut the presumption [of discrimination] by producing admissible evidence, sufficient to raise a genuine issue of fact and to justify a judgment for the employer that its action was taken for a legitimate, nondiscriminatory reason.” *Guz*, 24 Cal. 4th at 355–56 (citation, alterations and internal quotation marks omitted).  If the employer succeeds, the plaintiff “must then . . . attack the employer’s proffered reasons,” *id.*, with “‘specific, substantial evidence of pretext,’” *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).  Such evidence must be sufficient to allow a trier of fact to conclude “*either*: (a) that the alleged reason for [the adverse employment action is] false, *or* (b) that the

true reason for [the adverse employment action is] a discriminatory one," *Nidds*, 113 F.3d at 918 (emphasis in original).

There is, however, one additional wrinkle: when a defendant-employer moves for summary judgment, the "'burden is reversed . . . .'" *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011) (quoting *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 224 (1999)); *see also Kelly v. Stamps.com Inc.*, 135 Cal. App. 4th 1088, 1097–98 (2005) (citing *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 850–51 (2001)). Thus, the moving defendant bears the initial burden to "show either that (1) plaintiff [can] not establish one of the elements of the FEHA claim or (2) there [is] a legitimate, nondiscriminatory reason" for its actions. *Lucent*, 642 F.3d at 745 (citation, alterations and internal quotation marks omitted).

To avert summary judgment, the employee must then "'demonstrate either . . . that the defendant's showing [is] in fact insufficient or . . . that there [is] a triable issue of fact material to the defendant's showing.'" *Id.* at 746 (quoting *Hanson*, 74 Cal. App. 4th at 225). The employee may do this by establishing pretext, "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)). "An employee . . . [cannot] simply show the employer's decision was wrong, mistaken, or unwise." *Id.* (citation and internal quotation marks omitted). As noted above, the employee's circumstantial evidence "'must be specific' and 'substantial.'" *Id.* (quoting *Godwin*, 150 F.3d at 1221).

Plaintiff alleges several factual bases for discrimination, and the court addresses each in turn.

### a. Orange Sergeant Position

Plaintiff's complaint alleges discrimination when he interviewed for the Orange sergeant position in 2000. He argues he suffered discrimination in two ways: (1) Hughie initially offered the position to Tomlin, a Caucasian, despite plaintiff's superior performance in the interview, Compl. ¶ 21, ECF No. 1-1; and (2) Standish asked plaintiff to write a

/////

memorandum discussing his qualifications for the sergeant position, a task others were not asked to complete, *id.* ¶ 21(c).

### i.   Initial Offering of Position to Tomlin

In regards to the first allegation, defendant CDI articulates and supports a legitimate, nondiscriminatory reason: Hughie offered the position to Tomlin because he had worked for the Inglewood Police Department and thus had more enforcement experience than plaintiff. Def.'s UMF 11, ECF No. 28. Defendant CDI also argues plaintiff has failed to make the requisite showing because he ultimately received the promotion and, as such, suffered no adverse employment action. Without deciding whether plaintiff suffered an adverse employment action, the court finds defendant CDI has met its initial burden on the basis of defendant CDI's articulated reason for its action and the undisputed record.

The burden thus shifts to plaintiff to establish pretext through specific, substantial evidence. *Wallis*, 26 F.3d at 890. However, plaintiff offers no evidence specifically pertaining to this incident. Instead, plaintiff argues generally that all of defendant CDI's articulated reasons are pretextual because of defendant CDI's racial demographics.

Statistical evidence can indicate pretext. *Diaz v. Eagle Produce Ltd.*, 521 F.3d 1201, 1209–10 (9th Cir. 2008); *Diaz v. Am. Tel.& Telegraph*, 752 F.2d 1356, 1363 (9th Cir. 1985) ("[S]tatistical evidence is helpful in showing that an employer's articulated reason for the employment decision is pretextual." ). Its persuasiveness, however, "'depends on all of the surrounding facts and circumstances.'" *Sengupta v. Morrison-Knudsen Co.*, 804 F.2d 1072, 1075 (9th Cir. 1986) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)). For instance, "statistical evidence derived from an extremely small universe . . . has little predictive value and must be disregarded." *Id.* at 1076 (citation and internal quotation marks omitted). Rather, in order to "raise a triable issue of fact regarding pretext, the statistics 'must show a stark pattern of discrimination unexplainable on grounds other than'" race, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283 (9th Cir. 2000) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990)), and "account for possible

/////

1   nondiscriminatory variables, such as job performance," *Aragon v. Republic Silver State*

2   *Disposal Co.*, 292 F.3d 654, 663 (9th Cir. 2002). Such evidence must also be "substantial and

3   specific." *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1172 (C.D. Cal. 2013) (citing

4   *Diaz*, 521 F.3d at 1209).

5            Here, plaintiff relies primarily on defendant Plein's personal knowledge as

6   evidence of pretext. Plein testified that, in his twenty-one-year career, he knew of only one

7   black captain and two black sergeants in the organization of approximately two hundred

8   people. Plein Dep. 34:1–35:14; Pl.'s UMF 8, ECF No. 48. By plaintiff's calculation, this

9   equals 0.5 and 1 percent respectively. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("MSJ") 19,

10  ECF No. 46. Plaintiff also points to defendant CDI's internal statistics documenting that there

11  are currently no black captains. Karalash Decl. Ex. 8, ECF No. 51, DOI00183. Contending

12  *Brown v. Kinney Shoe Corp.* stands for the proposition that "failure to promote an African-

13  American store manager to manage a store in a white community may constitute intentional

14  discrimination," 237 F.3d 556, 565 (5th Cir. 2001), plaintiff concludes defendant CDI's

15  statistics evince the pretextual nature of its articulated reasons and present a question suitable

16  for the trier of fact. Pl.'s Opp'n to Def.'s MSJ 19, 23, ECF No. 48.

17           Plaintiff's argument is unavailing. The statistical evidence to which he points,

18  devoid of context, analysis or explanation, is neither substantial nor specific. Plaintiff argues

19  that the fact that defendant CDI has had only one black captain and two black sergeants in the

20  past twenty years must indicate discriminatory intent. However, without context—the relative

21  applicant pool, the number of black employees in intermediate positions, the promotion rate of

22  existing black employees—the numbers are meaningless. Plaintiff compares the number of

23  black captains and sergeants to the total number of sworn officers, but it is unclear what import

24  this ratio has. Plaintiff also fails to consider nondiscriminatory factors, such as job

25  performance or self-selection.

26           Further, as plaintiff conceded during argument, these numbers are based on

27  defendant Plein's personal knowledge and are, therefore, anecdotal. Plaintiff cites only one

28  other statistic, indicating that of eighteen current captains, none is black. Karalash Decl. Ex. 8,

ECF No. 51, DOI00183.  However, under Ninth Circuit authority, this figure alone is

insufficient to establish pretext.  *See Sengupta*, 804 F.2d at 1075–76 ("[S]tatistics from small

applicant pools such as a pool of [thirty] persons are not dispositive.").  Finally, *Brown*,

addressing a dissimilar, suspect set of facts—a black man was allowed to manage large-volume

stores with majority ethnic clientele but not smaller-volume stores with majority white

clientele—is inapposite.  237 F.3d at 565.  As to the initial decision to hire Tomlin, defendant

CDI has thus met its burden on summary judgment.

## ii.   The Memorandum

Regarding the second allegation, related to the Orange sergeant position,

defendant CDI again articulates and supports a legitimate, nondiscriminatory reason: "Standish

told Plaintiff he would take care of the misunderstanding [over the hiring of Tomlin] . . . and

asked Plaintiff to assist him by providing a written synopsis of his qualifications for

comparison purposes, or so that they could be shown to other decision makers . . . ."  Def.'s

Resp. to Pl.'s Opp'n to Def.'s UMF 6, ECF No. 52-1.  Others were not asked to write similar

memorandums because plaintiff and Tomlin were the only two then under consideration.

Further, Tomlin was not asked to write a memorandum because Standish and Malone were

advocating on behalf of plaintiff only.  *See* Def.'s UMFs 2–13, ECF No. 28.  Defendant CDI

also argues plaintiff has failed to make the necessary showing because plaintiff ultimately

received the promotion and, as such, suffered no adverse employment action.  Without deciding

whether plaintiff suffered an adverse employment action, the court finds defendant CDI has

met its initial burden on the basis of defendant CDI's articulated reason for its action.

Plaintiff must then establish pretext.  However, he again offers no evidence

specifically pertaining to this incident.  Instead, plaintiff again argues generally, based on

defendant CDI's racial demographics, that all of defendant CDI's articulated reasons are

pretextual.  Because plaintiff's argument here is identical to that above, so too is the court's

analysis: plaintiff's statistical evidence alone is insufficient to raise a genuine issue of material

fact as to pretext.  Thus, as to the memorandum plaintiff was required to write, defendant CDI

has met its burden on summary judgment.

b. Performance Reviews

Plaintiff's complaint alleges he suffered discrimination when his supervisors failed to give annual performance reviews between September 2003 and his retirement in March 2013.  Compl. ¶¶ 35(a)–(b), ECF No. 1-1.  He argues that others received reviews, but he did not on account of his race.  *Id.* ¶ 36.

In response, defendant CDI articulates and supports legitimate, nondiscriminatory reasons for its actions.  York, plaintiff's supervisor from 2003 to 2011, oversaw several employees and managed the then-new professional standards unit.  Def.'s UMFs 24–30, ECF No. 28.  Due to her responsibilities, she was too busy to prepare annual reviews for any of the employees she supervised.  *Id.* 27–28.  In the relevant period, the only reviews she prepared were those relating to the probationary status of a newly transferred employee.  Def.'s Resp. to Pl.'s Opp'n to Def.'s UMF 27, ECF No. 52-1.  Further, the employees who did not receive reviews included Caucasians and Latinos.  Def.'s UMF 29, ECF No. 28.

Rooney assumed responsibility for the professional standards unit, including plaintiff, in November 2011.  *Id.* 30–31.  When plaintiff's review was due in March 2012, Rooney did not review plaintiff's performance, believing York, who had supervised for eight of the previous twelve months, to be in a better position to do so.  *Id.* 34–35.  Plaintiff retired the following March before his next review came due.  *Id.* 36–37.  The court finds defendant CDI has met its initial burden on the basis of the articulated reasons for its actions.

It is plaintiff's burden, then, to present evidence of pretext.  As discussed above, plaintiff's statistical evidence is unavailing.  However, plaintiff also testifies he saw York prepare reviews of other employees.  Pl.'s Opp'n to Def.'s MSJ 27, ECF No. 46.  This testimony, devoid of detail or support, does not, however, undermine or contradict defendant CDI's explanations.  Instead, without more, it is consistent with York's explanation regarding the newly transferred probationary employees and thus fails to suggest pretext.  Because plaintiff's evidence is not sufficiently specific or substantial, defendant CDI has met its burden on summary judgment as to the reviews.

17

1          c. Fresno and Commerce Captain Positions

2          Plaintiff's complaint alleges he suffered discrimination when he interviewed for

3   the Fresno and Commerce captain positions in late 2004.  Compl. ¶¶ 34(a)–(d), ECF No. 1-1.

4   Plaintiff asserts he was directed to conduct an internal affairs investigation of Gomez, a bureau

5   chief, and one of his subordinates in August 2004 and that Gomez was then placed on the panel

6   that interviewed him for a promotional examination in September 2004.  *Id.* ¶¶ 34(a)–(b).  He

7   further alleges that Gomez threatened him due to interactions between plaintiff and Gomez's

8   sister-in-law.  *Id.* ¶¶ 34(c)–(d).  He concludes that "this blatant disregard for objectivity and

9   fairness goes to the clear disrespect of managers for the basic civil rights of African Americans

10  [sic] within [defendant] CDI."  *Id.* ¶ 34(b).

11         Defendant CDI provides evidence supporting a legitimate, nondiscriminatory

12  reason for placing Gomez on the panel.  As bureau chief for Central California, his region

13  encompassed both the Commerce and Fresno offices.  Def.'s UMF 47, ECF No. 28.  He would

14  therefore supervise the position for which plaintiff was interviewing, *id.* 45–46, and,

15  accordingly, participated in all the interviews for the position, *id.* 50.  Participation in the

16  process allowed the bureau chiefs to provide "valuable input into the makeup of the

17  management structure within the offices they supervise[d]," Def.'s MSJ 24, ECF No. 41, and

18  the record contains no evidence of a recusal policy.  Further, after he did not receive the Fresno

19  position, plaintiff voluntarily withdrew from consideration for the Commerce position.

20  Hightower Decl. Ex. G, ECF No. 29-1 at 177.  Defendant CDI has met its initial burden on the

21  basis of the articulated reason for its actions.

22         Plaintiff argues pretext by relying on the general statistical evidence considered

23  and rejected above and by insisting that Gomez was motivated by retaliatory intent.  Plaintiff

24  asserts repeatedly that Gomez sought retribution for plaintiff's internal affairs investigation and

25  a dispute with a relative.  However, the parties dispute whether Gomez was a target of the

26  investigation, Pl.'s Opp'n to Def.'s UMF 40, ECF No. 47, and even assuming its truth, the

27  allegation does not suggest racial discrimination.  Further, plaintiff has presented no evidence

28  to support this theory.  Rather, plaintiff's own communications after the interview state that

plaintiff was "not lodging a complaint," "saying that [he] was treated unfairly," or "implying that . . . Gomez acted unfairly . . . ." Hightower Decl. Ex. G, ECF No. 29-1, 177. Although the court recognizes plaintiff's difficult position—expressing dissatisfaction without jeopardizing future opportunities—the record is undeniable. Thus, lacking specific and substantial evidence, plaintiff has failed to establish pretext, and defendant CDI has met its burden on summary judgment as to the Fresno and Commerce captain positions.

                    d. Transfer Requests

           Plaintiff's complaint alleges he suffered discrimination when he attempted to transfer to Northern California in 2004 and 2005. Compl. ¶¶ 24–25(c), ECF No. 1-1. He claims that a "less tenured and less experienced" candidate was given the position he initially sought in Sacramento due to personal ties. *Id.* ¶¶ 24–24(c). Further, his subsequent request for a hardship transfer was denied because management told him the hardship had "evolved out of planned decisions." *Id.* ¶¶ 25–25(a). However, he claims that when he asked to speak directly with Insurance Commissioner Garamendi, his request was immediately approved with no further discussion. *Id.* ¶ 25(c).

           In response, defendant CDI first articulates and supports legitimate, nondiscriminatory reasons for its actions. Plaintiff's hardship transfer request was denied because Banda and York believed plaintiff's situation did not qualify him for such a transfer. Def.'s UMFs 66–69, ECF No. 28. When he received the request, Chief Banda, the decision maker, asked York to research and prepare a memorandum on whether plaintiff should receive the transfer. *Id.* 62–63. York concluded that his situation was self-induced because plaintiff and his family had decided to sell their home in Southern California and recommended denial. *Id.* 66, 67, 69. Banda followed the recommendation and denied the request. *Id.* 70. Plaintiff then filed a request for reconsideration, *id.* 72, in which he explained that his family's move to Oregon was prompted by the county's decision to close the Los Angeles hospital where his wife had been doing her residency, Hightower Decl. Ex. H, ECF No. 29-1 at 187–88. Nonetheless, Banda did not change his decision. Def.'s UMF 73, ECF No. 28. The court finds defendant CDI has met its initial burden on the basis of the articulated reasons for its actions.

Plaintiff argues defendant CDI's reasons are pretextual, insisting that York misrepresented his situation to prevent his transfer.  He also argues he was transferred to Sacramento "shortly" after asking to speak with Commissioner Garamendi and that the transfer "could have been" months before the formation of the new unit in Sacramento.  Pl.'s Opp'n to Def.'s MSJ 29–30, ECF No. 46.  However, once again, plaintiff offers no evidence aside from his bare assertions and the statistical evidence already discussed.

Even if it were incorrect or illogical for York to characterize plaintiff's situation as being within his control, her characterization and Banda's adoption thereof are not specific and substantial evidence of pretext.  Without more, a reasonable fact finder could not, on these bases, conclude that defendant CDI's articulated reason was false or that defendant CDI was more likely motivated by discriminatory intent.  *Lucent*, 642 F.3d at 746 ("An employee . . . [cannot] simply show the employer's decision was wrong, mistaken, or unwise." (citation and internal quotation marks omitted)).  Although defendant CDI does not address plaintiff's assertion regarding the transfer he initially sought, plaintiff has neither pleaded a claim for race discrimination on that basis—he contends the less qualified candidate received the position because he was "good friends with the bureau chief," Compl. ¶ 24(b), ECF No. 1-1—nor provided evidence thereof.  Thus, defendant CDI has met its burden on summary judgment as to the transfer requests.

e. <u>Orange Acting Captain Position</u>

Plaintiff's complaint alleges he suffered discrimination when Standish named Goldberg as acting captain during Avina's extended leave in early 2005.  Compl. ¶¶ 33–34, ECF No. 1-1.  Plaintiff claims he was only allowed to assume the role of acting captain when the assignment was too short to be paid, whereas Goldberg was paid for his tenure.  *Id.*

Defendant CDI articulates and supports a legitimate, nondiscriminatory reason for its actions.   Typically, for short-term absences, the role of acting captain was rotated among several sergeants, including plaintiff, to provide management experience.  Def.'s UMFs 84–85, ECF No. 28.  However, when Avina took an extended leave, Standish felt it necessary /////

20

1  to name a single acting captain to provide more consistency.  *Id.* 80–81, 86.  At that time,

2  Goldberg was the most senior sergeant in the office, not plaintiff, and for that reason, he was

3  selected as acting captain.  *Id.* 87.  Defendant CDI has met its initial burden on the basis of the

4  articulated reasons for its actions.

5  Plaintiff does not dispute Goldberg's seniority but instead argues without

6  evidentiary support that a policy of simply selecting the most senior officer is unsound.  Even if

7  such a policy were indeed unsound, this conclusion, without more, would still fail to

8  demonstrate the pretextual nature of defendant CDI's articulated reason.  *Lucent*, 642 F.3d at

9  746 ("An employee . . . [cannot] simply show the employer's decision was wrong, mistaken or

10  unwise." (citation and internal quotation marks omitted)).  With only the statistical evidence

11  discussed above, plaintiff therefore lacks specific and substantial evidence of pretext.

12  Defendant CDI has met its burden on summary judgment as to the selection of Goldberg as

13  acting captain.

14  f.  Vehicle Exchange

15  Plaintiff's complaint alleges he suffered discrimination when he was required to

16  exchange vehicles with another agent in early 2007.  He asserts that, on account of his race, he

17  was required to exchange a Dodge Durango with low mileage for a poorly maintained Ford

18  Taurus with higher mileage.  Compl. ¶¶ 30–32, ECF No. 1-1; Def.'s UMF 92, ECF No. 28.

19  Defendant CDI responds by articulating and supporting a legitimate,

20  nondiscriminatory reason for its action.  Prior to the vehicle exchange, plaintiff had been

21  responsible for firearms training.  Def.'s UMFs 89–90, ECF No. 28.  In that role, plaintiff

22  traveled frequently to conduct trainings, thus his vehicle had to be capable of safely, securely

23  and discreetly carrying weapons.  *Id.* 95.  When he left those duties, he was required to

24  relinquish the vehicle to his replacement.  *Id.* 89–90.  Defendant CDI has met its initial burden

25  on the basis of the articulated reason for its actions.

26  Plaintiff argues defendant CDI's reason is pretextual but offers no evidence in

27  support.  He claims Sarinana, plaintiff's replacement in the training role, was already driving a

28  pickup truck that was better suited to his new responsibilities than the Durango and that

21

Sarinana continued driving the truck even after he received the Durango.  As support, plaintiff cites only to defendant's undisputed fact 92.  This fact, which states "[p]laintiff switched cars with Sarinana, receiving in exchange [for the Durango] a Ford Taurus with 63,000 miles that had not been serviced for a year," does not support plaintiff's assertions.  Further, plaintiff concedes that York offered to switch vehicles with plaintiff when he complained about the one he received.  *Id.* 93.  The statistical evidence plaintiff cites generally does not save plaintiff's claim.  The court thus finds that plaintiff has failed to establish pretext through specific and substantial evidence, and defendant CDI has met its burden on summary judgment as to the vehicle exchange.

### g. Benicia Captain Position

Plaintiff's complaint alleges he suffered discrimination when he interviewed for the Benicia captain position in July 2010.  Compl. ¶¶ 13–17, ECF No. 1-1.  He claims that defendant CDI promoted McKenzie, an inferior Caucasian candidate, over him, and that, departing from standard procedure, plaintiff's interview was not recorded.  *Id.*

Defendant CDI responds by articulating and supporting legitimate, nondiscriminatory reasons for its actions.  McKenzie was promoted because he received the highest interview score based on standardized questions and rating criteria, not because he was Caucasian.  Def.'s UMFs 104–113, ECF No. 28.  Further, it was not standard procedure to record interviews.  Salinas Decl. ¶¶ 5–6, ECF No. 36.  Defendant CDI also argues plaintiff suffered no adverse employment action, but without deciding that question, the court finds defendant CDI has met its initial burden on the basis of the articulated reasons for its actions.

Plaintiff points to several bases for finding pretext.  First, as plaintiff notes, the candidates' interviews were rated according to nine criteria by defendants Weirich and Gonzalez, and their scores for plaintiff were identical for every criterion, as well as the total.  Hightower Decl. Ex. N, ECF No. 29-1, DOI00963–64.  Additionally, plaintiff claims without evidentiary support that he had previously conducted an internal affairs investigation of defendant Gonzalez, a fact Gonzalez failed to relay his superiors.  Lastly, plaintiff claims defendant Weirich made contradictory statements about the selection process and decision.

1   Whereas Weirich initially said in his July 30, 2010 email that no one had yet been chosen

2   because the decision was "important and difficult," Def.'s UMF 119, ECF No. 28, he

3   subsequently told plaintiff that McKenzie had been selected because he "aced" the interview,

4   Hightower Decl. Ex. E, 40:24–43:8, ECF No. 29-1.  Weirich also stated during his deposition

5   that the decision was made based on "the totality of everything."  Weirich Dep. 65:24–25,

6   66:1–2, Karalash Decl. Ex. 2, ECF No. 51.

7           On its face, the identical scores across nine categories is suspect.  However, the

8   court also notes that scores for the other candidates were identical across six of the nine

9   categories for one, and five of nine for the other.  Hightower Decl. Ex. N, ECF No. 29-1,

10  DOI00963–64.  The totals for the other candidates also differed by only one and two points

11  respectively.  *Id.*  Additionally, defendants Weirich and Gonzalez rated the interviews based on

12  the same standardized guidelines, Def.'s UMP 108–10, ECF No. 28, and a representative from

13  human resources stated in her declaration that identical scores were not unusual, Salinas Decl.

14  ¶ 5, ECF No. 36.  Without more, the identical scores are not sufficient to raise an issue of

15  material fact as to pretext because they show neither that defendant CDI's articulated reason

16  was false nor that defendant CDI was more likely motivated by discriminatory intent.  *See*

17  *Nidds*, 113 F.3d at 918.

18          Plaintiff's unsupported claim that he had previously investigated Gonzalez—and

19  that Gonzalez therefore wished to retaliate—does not implicate race discrimination, but instead

20  provides an alternative, though unacceptable, explanation.  Further, it is undisputed that

21  Gonzalez and Weirich were on the interview panel because each either held the relevant

22  classification or supervised individuals in that classification.  Def.'s UMF 103, ECF No. 28.

23          The court does not find Weirich's statements inherently contradictory or

24  indicative of pretext.  Even if McKenzie had "aced" the interview, the decision may still have

25  been difficult because all three candidates were qualified.  Although Weirich indicated he

26  accounted for McKenzie's interview performance, he said nothing to suggest that he discounted

27  other factors.  As such, his statement that McKenzie "aced" the interview is not inconsistent

28  /////

23

1    with consideration of "the totality of everything."  The statistical evidence plaintiff relies on

2    generally does not save his claim here.

3          Plaintiff has failed to establish pretext through specific and substantial evidence,

4    and defendant CDI has met its burden on summary judgment as to the Benicia captain position.

5                    h. Supervising Fraud Investigator II Classification Examination

6          Plaintiff also alleges he suffered discrimination when he sat for and failed the

7    statewide supervising fraud investigator II examination in June and July 2011.  Pl.'s Opp'n to

8    Def.'s MSJ 22, ECF No. 46.  He claims to have been discriminated against because the SPB

9    changed its scoring process between the 2011 administration of the exam and the previous

10   administration in 2006, which plaintiff had passed, without providing sufficient notification.

11   *Id.*  As with the 2010 captain interview, plaintiff claims Gonzalez's presence on his interview

12   panel is further evidence of discrimination.  *Id.*

13         In response, defendant CDI articulates and supports legitimate,

14   nondiscriminatory reasons for its actions.  The SPB, not defendant CDI, changed its statewide

15   scoring process in 2008 by instituting standardized benchmark scoring.  Def.'s UMF 188, ECF

16   No. 28.  All candidates were evaluated under this new framework, and there is no evidence to

17   support a conclusion it operated to discriminate against plaintiff alone.  Likewise, all candidates

18   were asked the same standardized questions and evaluated under the same standardized rubric.

19   *Id.* 135, 142–44.

20         The SPB rules also governed the interview portion of the examination.  *Id.* 147.

21   Under these rules, the panel was required to include a chairperson and two or more state

22   representatives.  *Id.* 148.  For this panel, defendant Plein selected Godard and defendant

23   Gonzalez so that both the fraud and investigations divisions of defendant CDI's enforcement

24   branch would be represented.  *Id.* 151–152.  The court finds defendant CDI has met its initial

25   burden on the basis of the supported, articulated reasons for its actions.

26         Aside from arguing that Gonzalez should not have been on this panel, plaintiff

27   identifies no basis for a finding of pretext.  As discussed with respect to the Benicia captain

28   /////

1  position, plaintiff's unsupported claim that Gonzalez nursed a vendetta militates against such a

2  finding, and the statistical evidence plaintiff cites generally does not save this claim.

3         Plaintiff has failed to establish pretext through specific and substantial evidence,

4  and defendant CDI has met its burden on summary judgment as to the supervising fraud

5  investigator II examination.

6                 i. <u>Harassment Claims</u>

7         Plaintiff concedes that he maintains a harassment claim only insofar as the

8  alleged harassment constitutes discrimination.  The factual bases for this claim are discussed

9  below.

10             i.   <u>Hughie's Comment(s)</u>

11        Plaintiff alleges he suffered discrimination when, between 1999 and 2000,

12 Hughie called Belize a third-world country and told plaintiff there was only one general in the

13 country and that plaintiff could be it.  Def.'s UMFs 129–31, ECF No. 28.  Plaintiff did not

14 report the comments to management.  *Id.* 131.

15        Defendant correctly argues that "these comments were isolated incidents that are

16 very remote in time" and that "none of the actions Plaintiff complained of altered his work

17 environment sufficiently such that he could not perform his job.  Plaintiff experienced no

18 extraordinary stress . . . ."  Def.'s MSJ 33, ECF No. 41.  As outlined above, an adverse

19 employment action must be "substantial and detrimental to be actionable."  *Horsford*, 132 Cal.

20 App. 4th at 373.  Such an action is to be contrasted with "a mere offensive utterance or even a

21 pattern of social slights," as well as "[m]inor or relatively trivial adverse actions or conduct . . .

22 that, from an objective perspective, are reasonably likely to do no more than anger or upset an

23 employee . . . ."  *Yankowitz*, 36 Cal. 4th at 1054.  Here, these isolated comments in a social

24 setting, however insensitive, are insufficient to constitute an adverse employment action.

25 Plaintiff has presented no evidence showing otherwise.

26        Defendant CDI has carried its burden on summary judgment as to Hughie's

27 comments.

28 */////*

ii.   York's Comment(s)

Plaintiff alleges he suffered discrimination when, in August 2010, York told plaintiff that "nobody lives" in Oakland and that, considering where he came from, he should be proud of his accomplishments.  Def.'s UMFs 126–28, ECF No. 28.

Defendant's arguments as to Hughie's comments apply equally here:  York's isolated comments in a social setting, however insensitive, are insufficient to constitute an adverse employment action.  Plaintiff has presented no evidence showing otherwise.

Defendant CDI has thus carried its burden on summary judgment as to York's comments.

iii.   Ferris's Email

Plaintiff alleges he suffered discrimination when, following a softball game in November 2001, Ferris sent an email with two attachments depicting: (1) a photoshopped picture of a prisoner with plaintiff's face superimposed; and (2) a photoshopped mugshot of plaintiff with the caption "FBI Ten Most Wanted Fugitive Usama Bin Lambey."  Def.'s UMFs 15–16, ECF No. 28.  Ferris sent no further emails after plaintiff told him they were offensive, and plaintiff did not report the emails to management.  *Id.* 17–19.

Defendant again argues correctly that this single unreported incident related to a recreational softball game is insufficient to constitute an adverse employment action.  While Ferris's email is offensive on its face, plaintiff has presented no evidence to show he experienced discrimination as a result.

Defendant CDI has carried its burden on summary judgment as to Ferris's emails.

j. Pattern or Practice

In light of all the above events, plaintiff also alleges defendant CDI engaged in a pattern or practice of discriminatory behavior.  Assuming plaintiff may maintain a FEHA violation, as under Title VII, on a pattern-or-practice theory, a plaintiff's ultimate burden is to show that "unlawful discrimination has been a regular procedure or policy followed by" the defendant, *Teamsters*, 431 U.S. at 360, "rather than the unusual practice," *id.* at 336.  While it

is typically the plaintiff's burden "to establish a prima facie case [showing] that such a policy existed," when moving for summary judgment, the defendant bears the burden of "demonstrating that [the plaintiff's] proof is either inaccurate or insignificant." *Id.* at 360.

Here, plaintiff has alleged "a systematic series of ongoing and continuous acts" of discrimination — at least a dozen — at the hands of defendant CDI.  Compl. ¶ 20, ECF No. 1-1.  However, in each instance, defendant CDI has "demonstrat[ed] that [plaintiff's] proof is either inaccurate or insignificant" by instead articulating and supporting a legitimate, nondiscriminatory reason for its actions.  Proving pattern or practice requires plaintiff to show multiple instances of discrimination, but defendant CDI has instead shown that plaintiff's proof is insufficient to establish a genuine issue of material fact as to even one.

Defendant has carried its burden on summary judgment as to plaintiff's claim of a pattern or practice of discrimination.

2. Disparate Impact

Plaintiff's FEHA allegations must also be evaluated under a disparate impact theory.  Under disparate impact, a plaintiff contends "employment practices that are facially neutral . . . in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Teamsters*, 431 U.S. at 335 n.15.  Like disparate treatment cases, disparate impact cases are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Rose*, 902 F.2d at 1421.

To establish a prima facie case, a plaintiff must: "(1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation . . . ."  *Id.* at 1424.  Proof of discriminatory intent is not required.  *Id.* "Rather, the focus in a disparate impact case is usually 'on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.'"  *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)).

"The statistical disparities 'must be sufficiently substantial that they raise . . . an inference of causation.'"  *Id.* (quoting *Watson*, 487 U.S. at 995).  To do so, they must be "of a kind and degree sufficient to show that the practice in question has caused the exclusion of

applicants for jobs or promotions because of their membership in a protected group." *Watson*,
487 U.S. at 994.  Despite the fact that "such statistics are often difficult to compile," a
prevailing plaintiff must produce "quantifiable data." *Garcia v. Spun Steak Co.*, 998 F.2d
1480, 1486 (9th Cir. 1993).  Further, "[t]he Ninth Circuit has warned district courts not to base
a disparate impact finding on a statistical sample that is too small." *Beale v. G.T.E. Cal.*, 999 F.
Supp. 1312, 1323 (C.D. Cal. 1996) (citing *Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431,
1433 (9th Cir. 1991)).

   In contrast to a disparate treatment case, plaintiffs in a disparate impact claim
"must do more than merely raise an inference of discrimination before the burden shifts; they
'must actually prove the discriminatory impact at issue.'" *Garcia*, 998 F.2d at 1486 (quoting
*Rose*, 902 F.2d at 1421).  "[T]he plaintiff must prove the existence of adverse effects of the
policy, must prove that the impact of the policy is on terms, conditions, or privileges of
employment of the protected class, must prove that the adverse effects are significant, and must
prove that the employee population in general is not affected by the policy to the same degree."
*Id.*  A plaintiff "does not make out a case of disparate impact simply by showing that 'at the
bottom line,' there is racial *imbalance* in the work force." *Wards Cove Packing Co. v. Atonio*,
490 U.S. 642, 657 (1989) (emphasis in original), *superseded by statute on other grounds*, Civil
Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, *as recognized in Wal-Mart Stores,
Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2555 (2011).

   However, as discussed above with disparate treatment, where a defendant-
employer moves for summary judgment, the "burden is reversed," and the moving defendant
must "show either that (1) plaintiff [can] not establish one of the elements of the FEHA claim
or (2) there [is] a legitimate, nondiscriminatory reason" for its actions. *Lucent*, 642 F.3d at 745
(citation, alterations and internal quotation marks omitted).  The employee must then
"'demonstrate either . . . that the defendant's showing [is] in fact insufficient or . . . that there
[is] a triable issue of fact material to the defendant's showing.'" *Id.* at 746 (quoting *Hanson*,
74 Cal. App. 4th at 225).  The employee may do this by establishing pretext, "'either directly
by persuading the court that a discriminatory reason more likely motivated the employer or

1    indirectly by showing the employer's proffered explanation is unworthy of credence.'"  *Id.*

2    (quoting *Godwin*, 150 F.3d at 1220).  The employee's circumstantial evidence "'must be

3    specific' and 'substantial.'"  *Id.* (quoting *Godwin*, 150 F.3d at 1221).

4             Here, defendant CDI has shown "show[n] . . . that . . . plaintiff [can] not

5    establish . . . the elements of the FEHA claim . . . ."  *Id.* at 745 (citation, alterations and internal

6    quotation marks omitted).  Already rejected with reference to disparate treatment, plaintiff's

7    statistics, devoid of context and based on insufficient sample sizes, provide only a "bottom

8    line" showing of racial demographics insufficient to raise a triable issue of fact as to either

9    discriminatory impact or causation.  *Wards Cove*, 490 U.S. at 657; *see also Garcia*, 998 F.2d at

10   1486.  Further, plaintiff fails to identify a specific CDI practice challenged as discriminatory.

11   Such a nonexistent showing is insufficient as a matter of law to establish disparate impact.

12   *Rose*, 902 F.2d at 1424; *see also Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002)

13   ("Plaintiffs generally cannot attack an overall decisionmaking process . . . , but must instead

14   identify the particular element or practice . . . that causes an adverse impact.").

15            As plaintiff's claims fail under both disparate treatment and impact, summary

16   judgment is GRANTED in favor of defendant CDI as to the FEHA claim based on race and

17   national origin discrimination.

18       B.  FEHA Harassment Claim

19            The FEHA also prohibits harassment of an employee on account of race, color,

20   or national origin.  Cal. Gov't Code § 12940(j)(1).  A harassment claim is distinct from a

21   discrimination claim, *Miller v. Dep't of Corrs.*, 36 Cal. 4th 446, 460 n.5 (2005), with

22   harassment "focus[ing] on situations in which the *social environment* of the workplace

23   becomes intolerable because the harassment . . . communicates an offensive message to the

24   harassed employee," *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 706 (2009) (emphasis in

25   original).  The harassing communications must be subjectively and objectively offensive.

26   *Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 877 (2010) (citing *Nazir v. United*

27   *Airlines, Inc.*, 178 Cal. App. 4th 243, 263–64 (2009)).  Because it is concerned with the social

28   environment, harassment does not include "conduct of a type necessary for management of the

employer's business or performance of the supervisory employee's job," such as hiring, firing, promoting, demoting and job assignments.  *Reno v. Baird*, 18 Cal. 4th 640, 645–46 (1998). Further, harassment cannot be "'occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or . . . generalized nature.'" *Aguilar v. Avis Rent A Car Sys. Inc.*, 21 Cal. 4th 121, 131 (1999) (quoting *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 610 (1989)).

Plaintiff does not oppose the motion on this claim and, as discussed above, conceded during argument that he maintains a harassment claim only insofar as it constitutes discrimination.  Thus, summary judgment is GRANTED in favor of defendant CDI as to harassment in violation of the FEHA.

C. <u>FEHA Failure to Prevent Discrimination and Harassment Claim</u>

The FEHA also requires employers to "take all reasonable steps necessary to prevent discrimination and harassment from occurring." CAL. GOV'T CODE § 12940(k).  Such steps "should persuade individual harassers to discontinue unlawful conduct" by "impos[ing] sufficient penalties to assure a workplace free from . . . harassment." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (internal citations and quotation marks omitted).  An employer, however, may only be held liable for failure to prevent discrimination or harassment where the employee first establishes that discrimination or harassment has in fact occurred. *Kohler v. Inter-Tel Tech.*, 244 F.3d 1167, 1174 n.4 (9th Cir. 2001) (citing *Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App. 4th 280, 287-89 (1998)) ("California courts have determined that the 'reasonable steps' language is only a basis for liability if the plaintiff proves that actual discrimination or harassment occurred. . . . [T]his provision is not an independent basis for liability under FEHA.").

Here, plaintiff has not established a genuine issue of material fact as to either discrimination or harassment.  Thus, summary judgment is GRANTED in favor of defendant CDI as to failure to prevent discrimination or harassment in violation of FEHA.

/////

/////

D.  <u>Section 1983</u>

A claim under 42 U.S.C. § 1983 has two elements: (1) a violation of a federal constitutional or statutory right, (2) committed by a person acting under state law.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  As the court concludes above that no discrimination or harassment has occurred, and thus no violation of a right, summary judgment is GRANTED on this claim in favor of defendants Weirich, Plein and Gonzalez.

IV.      <u>CONCLUSION</u>

For the above reasons, the court GRANTS defendants' motion for summary judgment in its entirety.

IT IS SO ORDERED.

Dated:  January 22, 2014.

UNITED STATES DISTRICT JUDGE

31